# Age-Herald Company v. Potter.

*Bill in Equity to set aside Fraudulent Conveyance.*

1. *Conveyance of property by insolvent corporation, as security for existing debts and for future advances; validity of. as against other creditors.*
—Where an insolvent corporation conveyed all its property to a trustee to secure an issue of its bonds, stipulating for retention of possession for ten years, and delivered the bonds, as collaterals for existing debts and for future advances, to certain creditors who had notice of the company's insolvent condition, leaving other creditors wholly unprovided for, and the corporation without means issuing out of its business to pay them anything,—such disposition of its property was fraudulent and void as between the unsecured creditors and said secured creditors, whatever intent may have in fact actuated either the corporation or the secured creditors.

APPEAL from the Chancery Court of Jefferson.
Heard before the Hon. THOMAS COBBS.

The bill in this case was filed to set aside the mort-
gage and bonds mentioned in the opinion. The defend-
ants demurred to the bill upon the following grounds :
"(1) Said bill is defective and insufficient in law, in
that it makes a general allegation that said deed of trust
is void for want of authority in the Age-Herald Company
to execute the same, and it fails to set out such facts as
show that said Age-Herald Company had no such au-
thority. (2) That complainants have an adequate

remedy at law. (3) That said bill is defective and insufficient in law, and without equity, in that it does not allege that said deed of trust was executed at the instance of Pinckard and O'Brien, or that they participated in its execution as directors, or that they contemplated securing their debts by a transfer of said bonds when said deed of trust was authorized to be executed. (4) Said bill fails to show that the complainants have any lien on said property in said deed of trust or on said bonds, or that said Pinckard, O'Brien and First National Bank were insolvent. (5) Said bill fails to allege any purpose on the part of said Pinckard, O'Brien, and First National Bank to place said bonds, or the proceeds of same, beyond the jurisdiction of the court. (6) Said bill fails to allege that said debts due to said Pinckard, O'Brien, and First National Bank were created prior to the execution of said deed of trust. (7) Said bill fails to show that, when said deed of trust was executed, it was intended by said Age-Herald Company, or by said Pinckard, O'Brien, and First National Bank, that a transfer of the said bonds should be made to said Pinckard, O'Brien, and First National Bank. (8) Said bill fails to show that the property and income are not sufficient to pay off the debts of said Age-Herald Company, or that the execution of said deed of trust will in any way interfere therewith." Upon the hearing of this demurrer, the chancellor overruled each ground thereof. Upon the submission of the cause, upon the pleadings and proof, a decree was rendered granting the relief prayed for. The defendants appeal from that decree, and assign the same as error.

J. J. ALTMAN, for appellants O'Brien, Pinckard, and Age-Herald Company.—1. The transfer of the bonds to O'Brien was valid, because, *first*, the evidence shows clearly that the Age-Herald Company was solvent when these bonds were authorized and issued; and, *second*, when the contract with O'Brien for transfer of the bonds was made he was not a stockholder or officer of the company; so that the case of *Corey v. Wadsworth*, 99 Ala. 68, on the point of transfers by insolvent corporations can have no application here. 2. The Age-Herald Company owed O'Brien an old debt, secured by preferred stock. A part of the agreement by which the bonds were

issued was that O'Brien was to surrender this stock. A
creditor cannot, as matter of equity, come in and ask
that a trade made under such circumstances be declared
fraudulent. 3. The corporation was a going concern;
its officers were making an honest effort to protect its
property, creditors and stockholders. They had the
right, under the circumstances, to secure any creditor,
even an officer of the company.—*O'Conner's Case*, 95 Ala.
614; *Richwald's Case*, 106 Ill. 439; *Paulding's Case*, 94 N.
Y. 334; *Twin Lick Oil Co. v. Marbury*, 91 U. S. 587.
The evidence shows that the Age-Herald Company was
not an insolvent corporation, according to the definition
given in *Corey v. Wadsworth, supra.*

A. T. London, also, for appellant O'Brien.

Hewitt, Walker & Porter, for appellants Birming-
ham Trust & Savings Company and the First National
Bank of Birmingham, cited *Smith v. Collins*, 94 Ala. 394;
*Corey v. Wadsworth*, 99 Ala. 68; *Lucas v. Bank*, 2 Stew.
280; *Goodbar, White & Co. v. Daniel*, 88 Ala. 583; *Fren-
kel v. Hudson*, 82 Ala. 158; *Howell v. Carden*, 99 Ala. 100;
*Pattison v. Bragg*, 95 Ala. 55; *Pollock v. Meyer*, 95 Ala.
172; *Fergason & Co. v. Hall*, 99 Ala. 209.

W. C. Ward, *contra*, filed a written argument, dis-
cussing the case at length, and cited the following:
*Lyons-Thomas Hardware Co. v. Perry Stove Manufacturing
Co.*, 27 S. W. Rep. 100; *Corey v. Wadsworth*, 99 Ala. 68;
*Bilberry v. Mobly*, 20 Ala. 560; *Ansley v. Carlos*, 9 Ala.
973; *Lawson v. O'Rear*, 7 Ala. 784; *Beason v. Wiley*, 28
Ala. 575; *Wiley v. Knight*, 27 Ala. 335; *Reynolds v. Welch*,
47 Ala. 200; *Thames v. Rembert*, 63 Ala. 561; *Levy & Co.
v. Williams*, 79 Ala. 171; 44 Fed. Rep. 231: *Birmingham
Mining & M. Co. v. Mutual L. & T. Co.*, 96 Ala. 364;
*Hubbard v. Allen*, 59 Ala. 283; *Adams v. Thornton*, 78
Ala. 490; *McDowell v. Steele*, 87 Ala. 493.

McCLELLAN, J.—The bill in this case is filed by C.
Potter, Jr. & Co. against the Age-Herald Co., the First
National Bank of Birmingham, the Birmingham Trust
& Savings Co., W. P. Pinckard and F. P. O'Brien. Com-
plainants are simple contract creditors of the Age-Her-
ald Company in the sum of $6,700, and were such cred-

itors when the latter executed a certain mortgage or deed of trust to secure bonds issued by it. The Trust & Savings Company is trustee in said deed. The First National Bank is a creditor of said company in about the sum of $27,000, and holds twenty-seven of said bonds, of the face value of $1,000 each, as collateral security for its debt. O'Brien is also a creditor of said company, his debt being about $26,000, and he holds twenty-two of said bonds as collateral thereto. Pinckard is a creditor also to a small amount, and one of said bonds, the only one remaining of the fifty secured by said deed, went into his hands as collateral security. The execution of said mortgage and the issuance and hypothecation of said bonds came about in this way : On March 10, 1891, the stockholders of the Age-Herald Company, premising that the company, "for the successful operation of its newspaper business, needs and requires certain working capital," proceeded, "in order to provide such working capital, as well as for other necessary uses and purposes of the company," to resolve that the said company "shall and will issue its first mortgage bonds to the aggregate amount of fifty thousand dollars, payable ten years after date thereof, and with interest payable by coupons semi-annually at the rate of six per cent. per annum, and each of said bonds shall be for the sum of one thousand dollars ; and that to secure said bonds said company shall and will execute a mortgage on all its property, franchises, rights and privileges to such trustee as the board of directors shall select, and said mortgage and bonds shall contain such stipulations, conditions, covenants and agreements, and be of such form and date as the board of directors may prescribe and determine;" and the directors were given power and authority to sell, hypothecate, and otherwise dispose of the whole or any part of said bonds, at such times, in such manner and upon such terms as the directors might deem proper, "for the purpose of providing such working capital, and for any other necessary uses and purposes of the company." The board of directors acted on this resolution March 18th, selected the Trust & Savings Company to be trustee, and directed the president and secretary to prepare said morgage and bonds, and execute the same; and at the same meeting a committee was appointed to ascertain "what arrangements could be made with the

First National Bank of Birmingham in reference to its debt against the Age-Herald." On March 24th another meeting of the directors was held, at which the number of directors was increased to six, F. P. O'Brien was elected to be the additional director, Pinckard, the president and business manager of the company, resigned those offices, and O'Brien was elected to fill them; and the meeting adjourned to a later hour of the same day. On reconvening, the following proceedings were had, as shown by the minutes of the board : "The committee, consisting of J. J. Altman, Jackson and Pinckard, to see what arrangements could be made with the First National Bank as to its [Age-Herald's] debt to the bank, reported that said bank was willing to extend its debt for four months, and make advances to the company, provided the Age-Herald Company would hypothecate as collateral security twenty-seven of the bonds of this company for said debt and advances. It was ordered that this proposition be accepted, and that said bonds be delivered when completed and executed. It was further ordered that twenty-one of said bonds of the Age-Herald Company be delivered to F. P. O'Brien, to secure the debt due him, and to secure further advances to the Age-Herald Company to be made by said O'Brien in pursuance of contract heretofore made with said O'Brien. It was further ordered that, in the event that the said bonds could be sold at not less than ninety cents on the dollar net, the same be done, and the proceeds applied to the debts of this company and further expenses." On April 1, 1891, the mortgage thus provided for was executed by the Age-Herald Company, covering and conveying all the property, franchises, &c., then owned by the company, or that should belong to the company at any time during the ten years to elapse before the law day of the mortgage, for the security of said fifty bonds and the interest thereon, which latter was payable on the 1st days of April and October in each year. A short time after this, and as soon as the bonds were prepared and executed, they were delivered to O'Brien and the bank is provided in the above order of the directors, O'Brien afterwards acquiring another bond. The debt of the First National Bank at this time was about $16,000, and it was increased, by advances to the "working capital" of the Age-Herald Company, to

about $27,000, before this bill was filed. Similarly O'Brien's debt was increased from about $13,000 to about $27,000 after the issuance and delivery of these bonds to him. The stockholders of the Age-Herald Company participating in the meeting at which the mortgage and bonds were authorized were Pinckard, Walker, Jackson, Linn, Hartt & Co. and Altman. As we have seen, Pinckard was a creditor, and received one of said bonds, Linn and Walker were directors of said First National Bank, the former being then its cashier. The directors of the company at the time the hypothecation of bonds with said bank and O'Brien was ordered were said Pinckard, Walker, Linn, Altman, Jackson and O'Brien, and all were present at the meeting which thus disposed of forty-eight, out of the issue of fifty, of said bonds; O'Brien at that time being, as we have seen, president and general manager of the Age-Herald corporation.

The bill, alleging substantially the foregoing facts, (except it takes no account of the increase of the debts of the bank and O'Brien after April 1, 1891, by reason of additional advances made by them, but avers that the only consideration for the hypothecation of said bonds was existing indebtedness to these parties), and further that the Age-Herald Company on April 1, 1891, was insolvent, and did not own assets sufficient, and did not then have the means, to pay its debts, and that said mortgage was executed, and said bonds were issued and thus hypothecated, with the intent on the part of the Age-Herald Company to hinder, delay and defraud complainant and its other creditors, and that said bonds were taken and received by said Pickard, O'Brien and the bank with a knowledge on their respective parts of the said alleged financial condition of the said company, and with a like intent to hinder, delay and defraud creditors, &c.; seeks to have said mortgage or deed of trust declared fraudulent and void as to complainant, and vacated and set aside; to have said bonds adjudged to be likewise fraudulent and void, and that said Pinckard, O'Brien and the bank be required to surrender the same to the court for cancellation; to have a decree entered against said company for the amount of complainant's debt, to have a lien upon all the property, &c., embraced in said mortgage, de-

clared in complainant's favor, to have a receiver appointed to take charge of all said property, and carry on the business of the Age-Herald Company until a sale can be had to pay complainant's debts, &c., &c. The bill also alleged that the Age-Herald Company had no power under its charter to execute said mortgage and issue and hypothecate said bonds, and relief is prayed on this ground also. The answers denied the insolvency of the Age-Herald Company, and all notice of insolvency, if it existed, on the part of the several creditors when they took the bonds as collateral, and denied all intention on the part of the company and the other respondents to hinder, delay or defraud creditors, &c., and set up facts intended and going to show good faith, &c., &c., and averred that the Age-Herald Company had full corporate power to execute said mortgage and to issue and hypothecate said bonds, &c., &c. The chancellor overruled certain demurrers to the bill, and, upon submission for final decree on bill, answers and testimony, granted the relief prayed in the bill, on the ground that the mortgage and bonds were fraudulent and void; and from that decree this appeal is prosecuted.

It is to be noted here that all the stockholders participating in the meeting of March 10th, except Hartt & Co., whose holdings of stock were comparatively quite insignificant and who were represented when action was taken by Pinckard, were also the directors of the company, and the only directors until the meeting of March 24th, when O'Brien was elected as an additional member of the board and to the offices of president and business manager. It is fair to assume, therefore, that these persons were actuated by the same motives and purposes throughout all that was done in respect of the mortgage and bonds, whether acting as stockholders, as in the meeting of that body which authorized the execution of the mortgage and the issuance of the bonds, or as directors in the several closely following meetings of that body. This consideration, taken along with what they did as directors in carrying out the resolution they had adopted as stockholders immediately after such adoption, renders it clear to us that it was within their contemplation and was their purpose and intent throughout this whole transaction, from the call of the stockholders' meeting to the issuance and delivery of the bonds, that

the bonds should be secured, issued and appropriated precisely as they were in fact secured, issued and appropriated; or, in other words, that the intent and purpose all along was to deposit the bonds, secured by a ten year mortgage on the company's property, with O'Brien and the bank, to secure existing indebtedness to them and also to secure future advances of money to be made by them to enable the company to continue its business. True, there is a provision or direction in the directors' proceedings of March 24th for the sale of these bonds if ninety cents on the dollar net could be got for them, and there is something said, chiefly in the answers rather than the evidence, of efforts being made to sell them; but the sale thus contemplated, directed and attempted was to be of bonds already pledged to Pinckard, O'Brien and the bank, and in which the only beneficial interest the company had was secondary to the pledges; an interest only in the excess of proceeds over and above the amount necessary to pay these secured debts. The bonds were in point of fact thus appropriated to the bank, O'Brien and Pinckard before the mortgage was executed, long before they were in fact issued, and before there could have been any serious effort to sell them; and there is no evidence of any effort to sell them prior to this appropriation. In the effectuation of this purpose O'Brien participated as a director of the company, being present at the meeting which consummated the plan. And its effectuation in respect of the bank was in accordance with a proposition submitted by the bank, doubtless suggested to the latter by the committee of the directors who were appointed to make arrangements with the bank about its debt. So that, of course, both the bank and O'Brien must be held to have participated in this purpose and intent of the stockholders and the directors of the Age-Herald Company to execute, issue and secure these bonds and deliver them as collateral security for their debts, existing and to be incurred.

Now, if we assume the insolvency of the Age-Herald Company, its insufficiency of assets to pay these and other creditors, its lack of means to pay its debts, all which is averred in the bill, the inevitable effect and result of this transaction between the company, on the one hand, and Pinckard, O'Brien and the bank, severally, on the other, whereby all the company's property is put, if this

[Age-Herald Company v. Potter.]

mortgage is to stand, beyond the reach of its other creditors for the term of ten years, throughout which time the company is to remain in possession of all its property, paying only interest on the bonds to the creditors thus preferred, and to continue the use and enjoyment thereof, freed from molestation in respect to it by other creditors,—the necessary and inevitable result, we repeat, would be to hinder and delay such other creditors in the assertion of their rights and realization of their claims. And this would obviously be equally true whether the secured creditors intended or did not intend, in point of fact, that such should be the effect of the transaction or that such result should ensue from it. It is, therefore, plain on the facts and conclusions we have stated in connection with the assumption of the company's insolvency, upon which we have so far proceeded, that the only defense possible to the secured creditors against the present bill would be that they are *bona fide* purchasers of the bonds for value, without notice of the debtor's financial straits, and hence without notice of the natural and even inevitable consequences to flow from this transaction between them and the company. Other considerations aside, these respondents are not within the category just stated if the company was insolvent, or, whether insolvent in every sense or not, if its pecuniary condition was such that, unless other creditors might proceed against the property mortgaged, they would be hindered, delayed and postponed in the collection of their debts, and the secured creditors had knowledge or notice of such insolvency or of such pecuniary condition. So that one of the two remaining questions is, whether the Age-Herald Company was insolvent or in the condition just referred to at the time of the transactions complained of.

At the time this mortgage was executed, April 1, 1891, the indebtedness of the company, "*which had matured and been extended*," amounted certainly to from $43,000 to $45,000. How much of its indebtedness had not "matured and been extended" we are not informed, but we know that $4,500 of the complainants' debt had not then matured and been extended, and, without assuming there were other such debts, which is highly probable, of course, this would swell the total indebtedness, even on the showing made by the respondents, to from $46,500

to 49,500. It is made clearly to appear that its tangible property, its assets, exclusive of bills receivable, accounts for subscriptions, job printing, and the like, its assets which might be taken on execution, was greatly less in value than the amount of this indebtedness. Complainants' evidence goes to show that the value of such property was about $15,000, and this estimate is not shown to be incorrect. No witness undertakes to say that the value of the accounts added to the value of the plant and tangible personality would aggregate a sum greater than or equal to the indebtedness. O'Brien is the only witness upon this matter. At one place he testifies as follows: "Immediately upon taking charge, March 24, 1891, I went through the books kept up to that time, and made a transcript of the same, classifying the accounts as good, doubtful, and bad, the inventory taken of all the property including valuable press franchises and the accounts which I classified as good. I found that the property was worth a great deal more than its total indebtedness." But in another place he testifies that not "even so much as half the accounts classed as good could have been collected." So it is pretty clear that his opinion as to the solvency cf the accounts evidenced by his classification of them as good, doubtful and bad is of little if any value; and, were this otherwise, he nowhere testifies what amount of said accounts were even classed by him as good. He says that the aggregate of accounts good, bad and doubtful, as classified by him, was $28,000 or $30,000. So far as appears, the bad and doubtful accounts (which must have been very bad and very doubtful indeed when not half of the "good" accounts could be collected, and it is not shown that any of them were ever collected) made up the greater part of this aggregate; and when to them is added more than half of the "good" accounts which were not collectible, very little is left to go from this source into a solvent aggregate of the company's assets. But, as we have seen, the complainants' evidence is to the effect that the value of all the tangible property of the company was not in excess of $15,000. If we add to this the most optimistic estimate of the value of $28,000 or $30,000 of good, bad and doubtful accounts for subscriptions to daily and weekly newspapers and job printing, we should fall very far short of an aggregate that could be at all considered sol-

vency against an indebtedness of from $46,500 to $49,500, or even from $42,000 to $45,000. And we do not understand that this estimate of the complainants' witness is denied. O'Brien says he does not see how the witness could have made such an estimate, and he goes on to mention several items of property, and to give what he considers to have been the cost of one item, but he does not undertake to state the value of that or any other property, nor the aggregate value. It would seem to be very clear on these considerations alone that the company was insolvent.

But there is another line of facts bearing on this question which serves to dispel all doubt that might otherwise exist. These have reference to the earning capacity of the Age-Herald Company. And of this it is not too much to say that at no time since the organization of the company has its income been sufficient to pay its ordinary operating expenses; but that, to the contrary, from the first day of its life until it went into the hands of a receiver, just before this bill was filed, it has drawn heavily from other sources than its own earnings to pay such expenses. The company was capitalized at $200,000. Little of this came to the company as money, we are told. But, whatever the amount of money capital it started with may have been, it has long ago been applied and entirely appropriated to current operating expenses. The $13,000 due to O'Brien when the mortgage was made was for operating expenses in excess of earnings. The $16,000 due to the bank at that time was incurred in the same way. The $13,000 or $14,000 which O'Brien has since then advanced and the $10,000 or $11,000 which the bank has since then advanced went also into the capacious maw of the operating expenses account, and these advancements were made for that express purpose. Complainants' debt of nearly $7,000 is for material furnished. Pinckard's debt of about $1,900 was for his salary as an officer of the company. Another debt of $4,000 was due for paper to the Dupont Paper Company, and there were various other debts for type, paper and the like, which were not paid out of the income, could not be, and have never been paid at all. It must be that O'Brien is mistaken in saying that if accounts classed as good by him could have been collected the company could have paid its operating expenses, since it appears

that the arrears of such expenses, not counting debts for material, was more than the total of all the accounts, good, bad and doubtful. The value of the "press franchise," spoken of in the answers and testimony, and which is the only property of the company to which we have not referred, must have a been decidedly negative quantity, when the business in which it was used and in which alone it could have any value was thus from the beginning to the end losing and sinking money by thousands of dollars annually. It surely cannot admit of serious doubt, from any point of view, that this corporation, with more liabilities than assets, and not only unable to pay its debts, but without income sufficient to pay its bare operating expenses, and constantly going deeper into debt, was, on April 1, 1891, utterly insolvent.

Did the respondent creditors know or have notice of this insolvency? There can be little doubt that they did. O'Brien had the fullest possible knowledge of the company's history, its business, and its assets and liabilities. He was then and had been previously its president and business manager; and it is from him that most of the testimony in this case as to its financial condition at that time has come, and the facts he deposes to, so far as they then existed, were then known to him. There is something said in the case about O'Brien's willingness, after April 1, 1891, to pay all the debts of the company and $25,000 in addition for all its property, franchises, &c., &c. We do not understand that any proposition of this sort was ever made. Nor can we understand how any good business man could have contemplated making it, and still less how anybody could have hesitated about accepting it. O'Brien's willingness in this behalf must have been largely based upon considerations which would not address themselves to the ordinary man of business, or upon a confidence in a speedy and radical change of the conditions affecting the company's operations, which was not at all justified by existing or reasonably anticipated facts. But, it is argued, however mistaken he may have been in this, it yet shows that he could have had no intention, by taking the bonds, to hinder and delay other creditors. It is wholly immaterial to the case whether he, in point of fact, entertained such intention or not. If he knew enough to put a man of ordinary capacity and prudence on notice that the effect of this transaction would

[Age-Herald Company v. Potter.]

be to hinder and delay creditors, the intent is imputed to him by construction, though in reality it may have never entered his mind. Again, it is said that he could not have known of the company's insolvency, else he would not have made the additional advancements. This would amount to very little, even without explanation, since, on the facts which were known to him, the company was insolvent, and he must be held as an ordinarily prudent and careful business man to have known it to be insolvent. But a sufficient explanation lies right on the surface of this transaction for O'Brien's making the additional advances, notwithstanding the company's insolvency and his knowledge of it. He already had a debt of about $13,000. It was wholly unsecured, for the stock collateral which he held was valueless. He was disconnected with the business of the company. He may have thought that it would be to his interest to make further advances if by agreeing to do so he would be put back at the head of the concern, and given charge of its business, when his chances, by proper management of the company's affairs, to recover the original debt and advances would be better than to recover the original debt otherwise. Not only so, but by the arrangement he also acquired $21,000 of the mortgage bonds of the company, which he doubtless considered ample security for his $13,000 debt and such advances as he would make; and these facts, to our minds, furnish the fullest explanation of O'Brien's advances when he knew or had notice of the company's insolvency. And this latter consideration applies with equal force to the bank in refutation of the inference of want of knowledge or notice on its part of the company's insolvency, sought to be drawn from the fact that it too made additional advances. By doing so it acquired what it considered security for its theretofore unsecured debt, and also security for advances to be made. From the standpoint of the bank, and assuming, as it must have assumed, that the security was valid, nothing was more natural than that the bank, even with full knowledge of the company's insolvency, should have made further advances under these circumstances. As to such knowledge, Cameron, who was then its president, testifies that the bank was constantly receiving statements of the financial condition of the Age-Herald Company, but he

says it did not know of any indebtedness other than its own, except that to O'Brien. This is singular, to say the least, in view of the statements furnished it, which, it is to be presumed, showed the company's true condition. And that it did have notice of other indebtedness is affirmatively shown by other evidence, not to lay any stress upon the fact that Linn, its cashier and one of its directors, and Walker, another of its directors, were also active directors of the Age-Herald Company. Cameron probably means that he did not have such notice, or that so far as he knew the bank did not have it, and not affirmatively that the bank neither knew nor had notice of other indebtedness. But, apart from this, it is indisputable that all these secured creditors were fully aware that the Age-Herald Company had never from the beginning made operating expenses, and that it had all along been forced to draw from other sources the funds necessary to keep it a going concern. This knowledge was quite sufficient to put them all on inquiry as to other debts when the company proposed to execute a mortgage to them—for that is what it amounted to—covering all its property and rights of every description. Having this or other notice of such debts, the necessary effect of taking this security, tying up for ten years all of the company's property, the earnings of the company being wholly insufficient to pay expenses, so that nothing could possibly come to creditors from that source, was to hinder, delay and postpone the holders of such debts, and this, whether the company was in every sense insolvent or not; and the security, whatever intent may have in fact actuated either the company or the secured creditors in giving or taking it, is vitiated by the constructive fraud with which it is tainted in legal contemplation. Hence our conclusions, in line with the decree below, (1) that the company was insolvent; (2) that the secured creditors had notice of its insolvency; (3) that the necessary effect of the transaction was to hinder and delay other creditors of the insolvent concern, whether so intended or not; and (4) that, upon these considerations, the mortgage and bonds are void; and, further, that whether the Age-Herald Company was solvent or not, yet the conveyance of all its property to secure these creditors, stipulating for retention of possession for ten years, leaving other creditors wholly unpro-

[Smith v. Turpin *et al.*]

vided for, and without means issuing out of its business to pay them anything, was fraudulent and void as between them and the secured creditors who accepted the conveyance with notice of these facts.

Little has been or need be said in regard to Pinckard. The mortgage and bonds are void as a security for his debt on the same grounds as those stated above in respect of the bank and O'Brien; and the case is even clearer against him, for that he had the fullest knowledge of all the facts, and paid nothing of value for the bond that was deposited with him as collateral.

No relief was granted on the ground of a want of corporate power in the Age-Herald Company to execute said mortgage and bonds and to dispose of said bonds in the manner shown by the bill. Hence, if there was error in overruling the first assignment of demurrer, which we do not consider, it could not have injured the appellants.

The other assignments of demurrer are clearly untenable.

The decree of the Chancery Court must be affirmed.